**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

KIRK NELSON and JOHN EVANS, individually and on
behalf of all other persons similarly situated,

                                      Plaintiffs,

v.

SABRE COMPANIES LLC and SABRE ENERGY
SERVICES LLC,

                                      Defendants.

1:15-cv-00314 (BKS/TWD)

---

**APPEARANCES:**

*For Plaintiffs:*

Elmer R. Keach III
Maria K. Dyson
Law Offices of Elmer Robert Keach, III, P.C.
One Pine West Plaza, Suite 109
Albany, NY 12205

Gary E. Mason
Danielle L. Perry
Whitfield Bryson & Mason LLP
5101 Wisconsin Avenue NW, Suite 305
Washington, DC 20016

Nicholas A. Migliaccio
Jason S. Rathod
Migliaccio & Rathod LLP
412 H Street NE, Suite 302
Washington, DC 20002

D. Aaron Rihn
Robert Peirce & Associates, P.C.
2500 Gulf Tower
707 Grant Street, Suite 2500
Pittsburgh, PA 15219

*For Defendants:*

Shauna Johnson Clark
Joseph C. Dole
Kimberly F. Cheeseman
Andrew Yeh
Norton Rose Fulbright US LLP
1301 McKinney Street, Suite 5100
Houston, TX 77010

Matthew D. Stockwell
Andrew C. Smith
John F. Scalia
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Kirk Nelson and John Evans, along with individuals who have opted in to this collective action ("Opt-in Plaintiffs," and together with Mr. Nelson and Mr. Evans, "Plaintiffs"), bring this action against Sabre Companies LLC and Sabre Energy Services LLC (collectively, "Defendants" or "Sabre"), asserting claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201–219 (the "FLSA"), and Arkansas wage and hour laws for Defendants' alleged failure to pay overtime compensation. (Dkt. No. 46, ¶¶ 55–66). In addition to declaratory and injunctive relief, Plaintiffs seek to recover unpaid wages, overtime compensation, liquidated or punitive damages, and damages representing the employer's share of payroll taxes.[1] (*Id.* at 12–13). Plaintiffs have moved for partial summary judgment, (1) seeking to dismiss Defendants' exemption defenses under the FLSA, and (2) asking the Court to set a formula for calculating damages. (Dkt. No. 127). Defendants have also moved for partial summary judgment but only with respect to the formula for calculating damages. (Dkt. No. 126). For the reasons set forth below, the Court denies both parties' motions.

---

[1] The Amended Complaint additionally seeks designation of this action as an FLSA collective action and certification, under Rule 23 of the Federal Rules of Civil Procedure, of a class of operators and similarly situated individuals employed by Sabre in Arkansas. (Dkt. No. 46, at 2, 12). Magistrate Judge Thérèse Wiley Dancks granted Plaintiffs' motion to conditionally certify an FLSA collective action on September 30, 2016. (Dkt. No. 75). Since the filing of Plaintiffs' motion, in addition to the named plaintiffs, 58 individuals have opted in to this collective action. (Dkt. Nos. 54-8, 65–70, 74, 80–85, 89 (listing an aggregate of 60 names, including two duplicates)). The deadline for Rule 23 certification motions was September 29, 2017; Plaintiffs did not file a Rule 23 certification motion.

II.     FACTS[2]

A.     Sabre's Business

Sabre is a water treatment company that employs a patented "DiKlor" technology to decontaminate the water that oil and gas companies use in hydraulic fracturing ("fracking" or "frac") operations. (Dkt. No. 126-3, ¶ 1, Dkt. No. 149-4, ¶ 1). Sabre transports its mobile decontamination units by truck to its clients' sites; there, its employees use the units to add chlorine dioxide to treat surface and subsurface water. (Dkt. No. 126-3, ¶ 1; Dkt. No. 149-4, ¶ 2). Sabre's field workers are known as "operators." (Dkt. No. 126-3, ¶ 2). There are three categories of operators, Operators 1, 2, and 3; category placement depends on an employee's experience, skill level, and the types of jobs the employee is capable of performing. (Dkt. No. 149-4, ¶ 4; Dkt. No. 138, ¶ 4).

Before they become Operators 1, new Sabre employees must complete a training period, typically lasting approximately 90 days, during which time they are referred to as "helpers," "assistants," or "trainees." (Dkt. No. 126-3, ¶¶ 2, 3; Dkt. No. 149-4, ¶ 4). During their training, trainees work on the same shifts as operators and perform such tasks as hooking up, disconnecting, and breaking down hoses as part of the setup and takedown, as well as taking water samples. (Dkt. No. 138, ¶ 5). After their training, and unless Sabre discharges them, trainees become Operators 1 if they are capable of running the Sabre operation at the frac site alone. (Dkt. No. 126-3, ¶ 2).

---

[2] Only those facts relevant to the parties' motions are set out below, and are drawn from the parties' statements of material facts (Dkt. Nos. 126-3, 149-4), responses thereto (Dkt. Nos. 138, 142), and exhibits attached to the parties' submissions, to the extent that they would be admissible as evidence. Undisputed material facts supported by the record are taken from the moving party's statement of material facts, whereas disputed material facts supported by the record are taken from the nonmoving party's submissions. Where facts stated in a party's statement of material facts are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court has found such facts to be true. *See* L.R. 7.1(a)(3); Fed. R. Civ. P. 56(e).

## B.      Duties of Operators

Plaintiffs assert that "their primary duty was performing manual labor to treat water." (Dkt. No. 149-4, ¶ 14). Defendants respond that this is "a gross oversimplification of the complexities of the Operator job" and note that Plaintiffs had several job duties, including driving the decontamination units to the frac sites, operating the units, measuring chemicals, inputting data, performing tests, completing job safety analyses at the end of shifts, completing frac logs, interacting with oil company and third-party representatives to coordinate day-to-day activities, and monitoring the radio inside the unit to determine what the frac crew was doing. (Dkt. No. 138, ¶ 14; *see* Dkt. No. 129-7, at 24 (William Bierhaus, former president and chief operating officer ("COO") of Sabre Energy Services, explaining that treating water is "the functional description of the service we provide to the client" but not the operators' "job on location," and that operators were responsible, among other things, for "representing the company on location," "interfacing with the client on location," "supervising third parties on location," and "coordinating equipment and materials in preparation for the next series of work")).

Physical labor, such as taking samples, carrying hoses, and setting up and taking down equipment, was a component of operators' jobs. (*See, e.g.*, Dkt. No. 128-6, at 43–45). However, Defendants assert that operators "spent the majority of their time in a comfortable, climate controlled [decontamination] unit," (Dkt. No. 138, ¶ 20; Dkt. No. 137-1, ¶¶ 2, 3; Dkt. No. 128-11, at 107), and engaged in nonmanual activities, such as customer relations and coordination of on-site activities, (*see, e.g.*, Dkt. No. 129-6, at 69–71; Dkt. No. 129-8, at 93–94).[3]

---

[3] While Plaintiffs assert in their statement of material facts that the units were "primitive" and "often did not have roofs," (Dkt. No. 149-4, ¶ 22), they do not cite record evidence for that specific proposition. Instead, they cite deposition testimony to the effect that operators worked in challenging environmental conditions presenting physical, chemical, and even wildlife hazards. (*See id.* ¶¶ 22, 23).

The majority of Sabre's decontamination units had a laptop. (Dkt. No. 137-1, ¶ 3; Dkt. No. 129-10, at 56–57). The laptops ran Sabre's Frac-Log program, which is an "administrative, reporting and management tool for communication to [Sabre's] administrative staff, [Sabre's] technical staff and management staff." (Dkt. No. 129-10, at 57). Operators, or the trainees they supervised, were responsible for inputting data into the program, which could provide updates about operations in real time. (*See id.* at 57–60, 64; Dkt. No. 129-7, at 63 (Mr. Bierhaus defining the Frac-Log program as "a system developed internally to monitor ongoing operations in a real-time mode of location")). At his deposition, Albert Massey, a Sabre manager, explained that the program also gave operators a starting point for calculating the amount of chemicals needed to treat water. (Dkt. No. 129-11, at 89–90). The frac logs were viewable by management and Sabre's "administration," such as "billing, inventories, costing." (Dkt. No. 129-10, at 62, 64; *see also* Dkt. No. 130-3, at 25–29). John Mason, Defendants' chairman and chief technology officer ("CTO"), testified that he monitored frac logs.[4] (*Id.* at 57; *see also id.* at 58 ("[I]f I am notified that we have an operator that may be questionable, we may trade off amongst the people that know how to do operations in keeping an eye on that person.")). John Simone, who was a regional operations manager, agreed that it was fair to say that "frac logs were used as a tool to monitor operators" and "make sure that operators performed their duties in line with the company's expectations." (Dkt. No. 130-3, at 29).

Sabre had standard operating procedures ('SOPs") covering a variety of issues, "from how to transfer chemical, to how to park your truck, to how to recognize interference in titrations." (Dkt. No. 129-10, at 69). The SOPs were "a safe and quality assurance way to run the operation." (Dkt. No. 129-7, at 67). According to Defendants, however, many operators did not

---

[4] Defendants assert that "Sabre managers did not regularly monitor the frac logs," (Dkt. No. 138, ¶ 24), but Mr. Bierhaus' testimony, which they cite in support, does not indicate if Sabre management monitored frac logs regularly or not, (*see* Dkt. No. 129-7, at 63).

use the SOPs, and those that did considered those as guidelines on how to do their job, complementing the judgment and experience they gained on the job. (Dkt. No. 138, ¶ 27; Dkt. No. 128-11, at 37 (James Gann testifying that he was not aware of "any written guidelines" about how often to take samples and titrate); Dkt. No. 128-12, at 90–91 (Opt-in Plaintiff Terry Gore testifying that "[t]here may have been" written guidelines in the unit but he "never used them"); Dkt. No. 128-6, at 58–60 (Opt-in Plaintiff Fred Bean testifying that the "manual" indicated the ratio for titration, but agreeing that it was fair to say that he used "some knowledge and experience" to make adjustments)). According to Mr. Mason, Sabre's "SOPs are not step by step instructions on how to be an operator" and "do not cover every step that needs to be done on a job." (Dkt. No. 137-1, ¶ 7). In some circumstances, operators could deviate from the SOPs.[5] (Dkt. No. 129-10, at 25 (Mr. Mason testifying that "the more senior guys will understand which [SOPs] are ironclad and which ones aren't")).

At some point, Sabre distributed a smartphone application to assist operators with calculations. (Dkt. No. 129-10, at 55 (Mr. Mason stating that the application was "basically an advanced calculator")). Opt-in Plaintiff Steve Tondre explained how the application worked:

> It was pretty simple. Of course, you click on the app, and then you would just put in the volume of water that you wanted to treat. And then you would put it in – the demand of the water in there, and you'd put the residual and you'd hit go and it would tell you how much of the three chemicals you should be using.

(Dkt. No. 129-5, at 176).

Sabre billed its customers based on a price per barrel, which was set by Sabre management, not operators. (Dkt. No. 129-9, at 43). And Sabre management, not operators,

---

[5] Plaintiffs cite an email from Mr. Mason, in which he wrote: "NEVER deviate from or change a SOP without written authorization." (Dkt. No. 130-8). Defendants argue that the statement is taken out of context, and that "reading the email as a whole, Mr. Mason included the bullet point about SOPs to stress that Operators needed to follow health and safety procedures." (Dkt. No. 138, ¶ 28).

would decide which pieces of equipment to use on a well site. (*See id.* at 79). Defendants, however, point out that operators would be in charge of billing, (Dkt. No. 138-1, ¶ 8), and reporting to the customer the total number of barrels treated, (Dkt. No. 128-14, at 148–49).

At his deposition, Opt-in Plaintiff Kirt Hasselmeier, who managed Sabre operations, agreed that it was fair to say that the customer's "company man" was in charge of the well site and "everything that's going on on the pad." (Dkt. No. 129-9, at 72). He also acknowledged that Sabre employees had "to listen to the company man." (*Id.* at 73).

Plaintiffs assert that operators did not supervise or manage other operators. (*See* Dkt. No. 149-4, at ¶ 16; *see, e.g.*, Dkt. No. 128-6, at 79 (Opt-in Plaintiff Bean testifying that he did not supervise any Sabre field personnel)). But there is record evidence that operators supervised trainees, (Dkt. No. 129-3, at 38), and that at least some of them had managerial duties, (Dkt. No. 137-1, at 3–8 (affidavit of Mr. Mason singling out Roland Jackson as a lead operator whose position was "strictly managerial")).[6] Further, some operators gave recommendations as to who should or should not be hired as operators, although operators did not have ultimate authority to hire, promote, fire, demote, or discipline other Sabre employees. (Dkt. No. 138, ¶ 16; Dkt. No. 129-6, at 111–12; Dkt. No. 129-7, at 51–55; Dkt. No. 149-4, ¶ 18; Dkt. No. 129-9, at 70–71). Sabre managers testified that, depending on the time of year, as many as 50 percent of operators were on single-man crews, and that Sabre typically used one-man or two-man crews. (Dkt. No. 149-4, ¶¶ 35–38). Similarly, Plaintiffs testified that they most often worked alone on location or with just one other employee. (*Id.* ¶ 39). At the Anadarko site there would be three operators on location at a time, but they worked separately and did not supervise each other. (*Id.* ¶ 40).

---

[6] Further, when Plaintiffs finished their training and became operators, Defendants sent letters stating that Plaintiffs would be responsible for "handling all aspects of operations on the job site and supervising all field personnel on the job site." (*E.g.*, Dkt. No. 130-5). Plaintiffs deny having that authority. (*See* Dkt. No. 149-4, at ¶ 16).

C.      **Compensation and Hours**

Sabre classifies its operators as exempt from the FLSA's overtime provisions and pays

them an annual salary, paid in equal biweekly installments. (Dkt. No. 126-3, ¶¶ 3, 6; Dkt. No.

149-4, ¶ 3). Trainees, by contrast, are classified as nonexempt employees, and are paid $18 or

$22 per hour and one and a half times that hourly rate for any overtime (i.e., hours worked in

excess of 40 hours per week). (Dkt. No. 126-3, ¶ 2, Dkt. No. 149-4, ¶ 4). Trainees that become

operators after the training period are offered benefits, converted from hourly to salary pay, and

reclassified as exempt employees. (Dkt. No. 126-3, ¶ 3, Dkt. No. 149-4, ¶ 6).

In connection with this status change, employees would normally receive a letter stating

their job duties and explaining their reclassification as exempt employees. (Dkt. No. 126-3, ¶ 4).

The letters sent to Plaintiffs indicate that their pay would "be changed from hourly to $72,000

per year" and that their "role will be re-categorized as exempt." (Dkt. No. 126-3, ¶ 5). Further,

the letters state that their "work schedule will be based upon The Company's job scheduling

responsibilities and time constraints." (*Id.*; Dkt. No. 126-5, at 2–20). Plaintiffs, however, deny

that the schedules of Operators 1 were based on Sabre's "job scheduling responsibilities and time

constraints." (Dkt. No. 142, ¶ 5). According to Plaintiffs, "both Sabre and Operators understood

and expected that the salary was intended to cover a two week on two weeks off schedule with

12-hour days on the well site." (*Id.*; *see, e.g.*, Dkt. No. 128-12, at 21, 58; Dkt. No. 128-6, at 17–

18, 103, 109; Dkt. No. 129-9, at 33; Dkt. No. 128-13, at 109). In her affidavit, Theresa

O'Hanlon, Sabre Companies LLC's accounts manager, stated that "the most common, but not

the only, work schedule for Operators" was the "14 day rotation" (also referred to as "two weeks

on two weeks off"); under that schedule, operators worked 14 consecutive days . . . followed by

14 consecutive days off." (Dkt. No. 126-4, ¶ 8).

The parties dispute what number of hours the annual salary was expected to cover. According to Defendants, the annual salary "was designed to compensate the employee for all hours worked during the year." (Dkt. No. 126-4, ¶ 6). It was paid every two weeks, "regardless of the number of hours an employee may work during a given work week."[7] (*Id.*). Plaintiffs, on the other hand, assert that the annual salary was intended to compensate operators for hours worked under "a two week on two week off schedule with 12-hour days on the well site." (Dkt. No. 142, ¶ 6). While it is undisputed that Plaintiffs understood that they would receive the same pay every week, Plaintiffs deny that they understood their pay to cover variable work hours. (Dkt. No. 142, ¶¶ 7, 19).[8] For example, Opt-in Plaintiff Gore testified:

> Q. What did they tell you about the pay?
> A. That it would be hourly until your probation period was up, and then you would – it would be 72,000 a year.
> Q. Did they tell you anything about the work hours?
> A. Yes, sir.
> Q. What did they tell you about the work hours?
> A. Two-weeks on/two-weeks off, 12 hours a day, plus roughly 84 hours a week or more.

(Dkt. No. 128-12, at 21).

The parties' expectations aside, Plaintiffs did not in fact work only 26 rotation weeks per year or only 26 workweeks per year. (Dkt. No. 126-3, ¶ 17; Dkt. No. 142, ¶ 17). Further, they routinely worked more than 12 hours per day. (Dkt. No. 142, ¶ 18). Indeed, the record indicates that Plaintiffs worked varying hours, whether this variation is measured by numbers of hours per workweek as defined by Sabre,[9] (*see, e.g.*, Dkt. No. 126-5, at 129–31; *id.* at 95–110), number of

---

[7] Defendants claim that Plaintiffs knew that the 14-day rotation was not followed and that there was no set number of hours to work per week. (*Id.* ¶ 19). However, Defendants' record citations only indicate that the 14-day rotation was not strictly followed in practice, not that Plaintiffs knew that fact before they became salaried operators.

[8] At his deposition, Opt-in Plaintiff Ruiz testified that he complained to other Sabre employees that he made more money as a trainee paid hourly than as a salaried operator. (Dkt. No. 149-4, ¶ 7). The parties dispute whether operators would make more money being paid hourly under all circumstances. (*See* Dkt. No. 138, ¶ 8).

[9] Sabre's workweek started on 12:00 a.m. on Sunday and ended at 11:59 p.m. on Saturday. (Dkt. No. 16-3, ¶ 13).

9

hours per rotation week,[10] (*see, e.g.*, Dkt. No. 129-2, at 59 (Opt-in Plaintiff Ruben Ruiz testifying that his hours varied week to week, and that he worked "about 120 hours a week")), or number of hours per rotation, (Dkt. No. 128-6, at 103 (Opt-in Plaintiff Bean testifying that "sometimes we worked a – a very long amount of hours, sometimes longer than two weeks, sometimes longer than three weeks straight, and something I didn't sign up for honestly")).[11] Plaintiff were sometimes called in early from their rotation leave or had to work past the end of their scheduled 14-day rotation. (Dkt. 126-3, ¶ 10; *see also id.* ¶ 11).

## III.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The moving party may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on

---

[10] Plaintiffs' 14-day rotation schedule did not perfectly coincide with Sabre's workweek. (Dkt. No. 16-3, ¶ 14). The rotation typically started on Wednesday and ended on a Tuesday or Wednesday, often with travel time the day before and after the rotation. (*Id.*). Because Sabre's designated workweek did not coincide with the rotation schedule, Defendants remark that "a hypothetical employee" on "a strict 14/14 rotation" would "perform work during approximately 40 out of 52 work weeks [as defined by Sabre] per year." (*Id.* ¶ 15). Nevertheless, the Court notes that a hypothetical employee on a strict 14-day rotation would work only 26 rotation weeks per year.

[11] Plaintiffs deny that they "worked widely varying hours," but their denial is premised on the parties' expectations, not actual hours worked. (*See* Dkt. No. 142, ¶ 8). Accordingly, their denial is ineffectual.

which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.   DISCUSSION

### A.   Exemption Defense

Plaintiffs move for summary judgment against Defendants, (Dkt. Nos. 127, 149-5), seeking to dismiss Defendants' affirmative defenses under the FLSA's administrative, executive, professional, and motor carrier exemptions, (*see* Dkt. No. 50, Affirmative Defenses ¶¶ 3–4, at

10). Defendants do not oppose dismissal of their defenses under the executive, professional, and motor carrier exemptions; however, they do oppose dismissal of their administrative exemption defense. (*See* Dkt. No. 137, at 8 & n.2).

The FLSA generally provides that employers must pay overtime compensation to employees who work more than 40 hours per week at "a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207. The statute, however, provides a number of exemptions from the overtime compensation requirements. In relevant part, under the FLSA's administrative exemption, employees are exempt from the statute's overtime provisions if they are "employed in a bona fide . . . administrative . . . capacity." *Id.* § 213(a)(1). The regulations adopted by the Department of Labor ("DOL") pursuant to its rulemaking authority under the FLSA and effective at the time of the events alleged in this action defined the term "employee employed in a bone fide administrative capacity" as an employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . ;
>
> (2) Whose ***primary duty*** is the performance of office or non-manual work ***directly related to the management or general business operations*** of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the ***exercise of discretion and independent judgment*** with respect to matters of significance.

29 C.F.R. § 541.200(a) (2015) (emphases added). The parties dispute whether operators satisfy the requirements set forth in § 541.200(a)(2) and (3).

### 1.      Primary Duty

An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). The regulations further detail:

> Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider

> when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* The "amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," *id.*, but it is not dispositive, *see Scott v. SSP Am., Inc.*, No. 09-cv-4399, 2011 WL 1204406, at *10–14, 2011 U.S. Dist. LEXIS 32819, at *33–47 (E.D.N.Y. Mar. 29, 2011) (finding employee was exempt under the FLSA because she exercised discretion throughout the day, even though she spent 90% of her time performing nonexempt work).

Plaintiffs argue that Defendants have not produced evidence showing that operators' primary duty was office or nonmanual work, and that the evidence shows that "their work for Sabre was primarily manual and physical." (Dkt. No. 149-5, at 12). Plaintiffs cite testimony from operators stating that the job was physical, as it required dragging heavy hoses and working outdoors in a challenging and hazardous environment. (*Id.* at 12–14 (quoting testimony of Opt-in Plaintiffs Hasselmeier, David McCloskey, Tondre, Valls, and Bean)). Defendants counter that the record contains evidence that the manual labor involved in treating water was not operators' primary duty. (Dkt. No. 137, at 12–13). They cite the testimony of Sabre managers, who stated that operators had many responsibilities beyond treating water, such as managing Sabre's on-site operations and information flow, overseeing Sabre personnel at the frac site, interfacing with customers, and supervising third parties. (*Id.* at 13–15). Defendants also refer to operators' own testimony concerning their responsibility for, among other things, data collection and entry, customer relations, and invoicing. (*Id.* at 15).

13

Given this conflicting evidence, the Court finds that there are triable issues of fact as to whether Plaintiffs' primary duty was the performance of office or nonmanual work. *See Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 427–28 (S.D.N.Y. 2013) (denying summary judgment because of material issues of fact concerning the plaintiff's primary duty); *see also Galvan v. FTS Int'l Servs., LLC*, No. 16-cv-147, 2017 WL 3012651, at *3, 2017 U.S. Dist. LEXIS 130047, at *10 (W.D. Tex. June 7, 2017) (finding triable issues of fact where oil field worker stated that he spent his time running pumps from inside a data van in a dirty environment, whereas his employer contended that he also performed nonmanual work, such as running operations on the pad, interfacing with customers on site, and operating the data van); *Guyton v. Legacy Pressure Control*, No. 15-cv-1075, 2017 WL 244868, at *4, 2017 U.S. Dist. LEXIS 7836, at *11–13 (W.D. Tex. Jan. 18, 2017) (denying summary judgment "with regard to whether plaintiffs qualify as manual laborers" where the employer maintained that the operators' "primary duty was controlling and maintaining the pressure of grease injected into [oil] wells . . . by visually monitoring gauges and turning a knob to adjust grease levels," whereas plaintiffs contended that they worked outdoors in dangerous conditions, moving hoses and performing other manual labor).

### 2.    Work Directly Related to Management/Business Operations

To satisfy the requirement that the work be "directly related to the management or general business operations," an employee "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). "Employment may thus be classified as belonging in the administrative category, which falls squarely within the administrative exception, or as production/sales work, which does not." *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 531–32 (2d Cir. 2009). While the

14

Second Circuit has "drawn an important distinction between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business," courts have recognized that the "line between administrative and production jobs is not a clear one," *id.* at 532, 535, especially where "the job relates to the service industry," *D'Amato v. Five Star Reporting, Inc.*, 80 F. Supp. 3d 395, 416 (E.D.N.Y. 2015). The regulations provide some examples of work directly related to management or general business operations, including

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

*Id.* § 541.201(b).

Plaintiffs argue that there is no record evidence that operators' work was directly related to the management or general business operations of Sabre. (Dkt. No. 149-5, at 14). They assert that their work did not fall within the functional areas set forth in § 541.201(b), and that operators' work related to "producing Chlorine Dioxide and treating water." (Dkt. No. 149-5, at 15). Defendants respond that the "production/administrative dichotomy can be especially difficult to apply to workers in the oilfield," and that the question raises questions of fact for a jury to determine. (Dkt. No. 137, at 21–22). Defendants point to record evidence indicating that operators' duties related to "the management of Sabre's operations on site." (*Id.* at 22). They note, for example, that Opt-in Plaintiff Jackson's duties included "'managing employee schedules, project schedules, and equipment tasking,' as well as, assisting in approving expenses, estimating project supply requirements, . . . and ensuring that all paperwork was accurately filled out for invoicing purposes." (*Id.* at 23 (quoting Dkt. No. 137-1, at 5)). Defendants also cite

15

evidence that operators were involved in customer relationship management and data recording; such duties, they argue, "fall[] on the administrative side of the production/administrative dichotomy." (*Id.* at 23–24).

Viewing the evidence in the light most favorable to Defendants, the Court finds that there are triable issues of fact with regard to the nature of Plaintiffs' work, as a reasonable jury could find that operators were primarily responsible for running Sabre's operations and maintaining the customer relationship on site and therefore that their work was directly related to the general business operations of Sabre and its customers. *See Klein*, 979 F. Supp. 2d at 428 ("If indeed Plaintiff's primary duties included tasks related to vendor relations, customer communications and support, and order logistics, a jury could find that Plaintiff's duties were directly related to Defendant's general business operations and distinct from its sales activities.").[12]

### 3.   Exercise of Discretion and Independent Judgment

Plaintiffs argue that Defendants have failed to satisfy the third prong of the administrative exemption analysis, which requires that an employee's primary duty include the exercise of discretion and independent judgment with respect to matters of significance. DOL regulations further explain:

> In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

---

[12] The Court agrees with Defendants that Plaintiffs' cases are distinguishable. (*See* Dkt. No. 137, at 24–25). Notably, after noting that the production/administrative dichotomy was "not a clear one," the court in *Davis* relied on DOL regulations "clarify[ing] the classification of jobs in the financial industry." 587 F.3d at 532–33. Contrary to Plaintiffs' contention, (Dkt. No. 149-5, at 15), therefore, *Davis* does not compel summary judgment in the present case, where there are factual disputes about operators' duties. Plaintiffs' other cases likewise do not address the factual circumstances present here, where there is evidence to support Defendants' position that operators managed Sabre's operations remotely and maintained relationships with customers and third parties.

29 C.F.R. § 541.202(a). "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." *Id.* § 541.202(c). The regulations include a nonexhaustive list of factors to consider in making this determination, such as

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b).

Plaintiffs argue that there can be no genuine dispute of material fact about operators' lack of discretion, given that Sabre's SOPs "highly circumscribe[d] Operators' daily work activities" and "even dictated the precise manner in which Operators were to carry out their *production* work." (Dkt. No. 149-5, at 16–17 (quoting Mr. Mason's testimony about the topics covered by SOPs, as well as his email asking upper management to "instill" in operators that they should "NEVER deviate from or change a SOP"); *see also id.* at 18 (summarizing testimony from Sabre manager Mr. Simone concerning the importance of SOPs and testimony from operators with regard to following SOPs)). Further, Plaintiffs point to evidence that operators did not have

authority to set prices or the pieces of equipment used on the work site, and that the customer's "Company Man" directed operators' activities. (*Id.* at 19).

Defendants, on the other hand, contend that the record evidence could support a jury finding that Plaintiffs carried out "major assignments in conducting the operations" of Sabre's business, performed "work that affects business operations to a substantial degree," and represented Sabre in "handling complaints." (Dkt. No. 137, at 26 (quoting § 541.202(b))). In support, Defendants cite deposition testimony indicating that operators often worked alone, were Sabre's on-site representatives, handled the customer relationship on the location, monitored Sabre's operations, coordinated with contractors on the work site, had to "react to multiple variables that could change in the field," and had "stop-work authority" with regard to safety issues. (*Id.* at 28). With regard to SOPs, Defendants observe that "the SOPs did not cover every aspect of the Plaintiffs duties," that "Plaintiffs' testimony varied on whether they actually received SOPs and whether they actually followed SOPs," and that "operators were able to deviate from SOPs depending on the situation and their experience." (*Id.* at 27 (citing operators' and managers' deposition testimony)).

The Court agrees with Defendants that the record evidence raises triable issues of fact concerning the level of discretion and independent judgment that operators exercised in the field. *See Burton v. Appriss, Inc.*, 192 F. Supp. 3d 792, 798 (W.D. Ky. 2016) (finding that a sales employee exercised discretion and independent judgment given her role in managing customer relationships), *aff'd*, 682 F. App'x 423 (6th Cir. 2017). Moreover, the existence of SOPs does not necessarily negate the operators' exercise of discretion, especially given the parties' factual disputes about the availability, scope, and application of the SOPs. *See Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 476 (S.D.N.Y. 2008) (noting that "courts have

frequently concluded that the administrative exemption applies even in those situations in which the employee's discretion in the performance of her duties is circumscribed by an employer's detailed instructions or industry regulations"). As the parties genuinely dispute facts that are material to determining whether the administrative exemption applies, the Court denies Plaintiffs' partial motion for summary judgment as to the administrative exemption defense.

### B.     Calculation of Overtime Damages

Defendants move for partial summary judgment "on the issue of how to calculate overtime damages should Plaintiffs prevail at trial on their claim for unpaid overtime." (Dkt. No. 126-2, at 5). Plaintiffs cross-move for summary judgment on this issue and propose a different calculation method. (Dkt. No. 133, at 19). As mentioned above, the FLSA provides that employers must pay overtime compensation to employees who work more than 40 hours per week at "a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207. The parties disagree about how to calculate the regular rate and whether overtime pay should be calculated as one and one-half times the regular rate or only one-half times the regular rate. Defendants assert that because the parties agreed that Plaintiffs' salary was to compensate Plaintiffs for all hours worked, the hourly rate for work in excess of forty hours a week is only one-half times the regular rate.

Defendants contend that the "regular rate" in this case "should be calculated by dividing each Plaintiff's annual salary by 52 weeks, then dividing that weekly salary by the number of hours worked in each work week." (Dkt. No. 126-2, at 5). In other words, Defendants propose the following formula for calculating the regular hourly rate:

$$Regular\ Rate = \frac{Annual\ Salary}{52 \times Hours\ Actually\ Worked\ Each\ Week}$$

Sabre's designated workweek is defined as the seven-day period starting on Sunday at 12:00 a.m. and ending on Saturday at 11:59 p.m. (*See id.* at 7; Dkt. No. 126-4, ¶ 10). Because the hours that Plaintiffs actually worked varied from week to week, Defendants' formula entails a regular rate fluctuating from week to week. (Dkt. No. 126-2, at 15). Further, Defendants submit that, because their regular rate calculation already factors in hours worked overtime, compensation for unpaid overtime is equal to the number of hours worked in excess of 40 hours in each workweek multiplied by one half the regular rate for that week. (*Id.* at 5, 11). Their proposed formula for calculating unpaid overtime thus boils down to the following:

$$Unpaid\ Overtime = \frac{Annual\ Salary}{52 \times Hours\ Actually\ Worked\ Each\ Week} \times 0.5 \times Hours\ Over\ 40\ Each\ Week$$

By contrast, Plaintiffs assert that the regular hourly rate should be calculated by dividing the annual salary by 26 ("the number of weeks that it was intended to cover") and then by dividing that number by 84 ("the number of hours that the salary was intended to cover during the weeks Plaintiffs were on"). (Dkt. No. 133, at 19; *accord* Dkt. No. 141, at 12). Arithmetically, this proposal is tantamount to dividing the annual salary by 52 weeks and then dividing that weekly salary by 42 hours. Plaintiffs submit that they are entitled to overtime compensation equal to the number of hours worked in excess of 40 hours in each workweek multiplied by one and a half times their regular rate. (Dkt. No. 133, at 5, 19). This proposal yields the following formula:[13]

---

[13] The Amended Complaint proposed a different formula for calculating damages: "((Annual Salary ÷ 52) ÷ 40) x Total Number of Overtime Hours Worked x 1.5." (Dkt. No. 46, at 13). The Court notes that Plaintiffs' currently proposed one-and-a-half factor double-counts the straight-time compensation for the two hours over 40 that the parties allegedly intended to compensate through the workweek-equivalent salary. Indeed, according to Plaintiff's formula, the regular rate is equal to the workweek-equivalent salary divided by 42 hours, which means that Plaintiffs' salary already covers straight-time compensation for all 42 hours each week. The only unpaid compensation for those two hours is the overtime premium, which is equal to one-half the regular rate. *See* 29 C.F.R. § 778.325 ("If an employee whose maximum hours standard is 40 hours was hired at a fixed salary of $275 for 55 hours of work, he was entitled to a statutory overtime premium for the 15 hours in excess of 40 at the rate of $2.50 per hour (half-time) in addition to his salary, and to statutory overtime pay of $7.50 per hour (time and one-

$$Unpaid\ Overtime = \frac{Annual\ Salary}{52 \times 42} \times 1.5 \times Hours\ Over\ 40\ Each\ Week$$

The parties advance various arguments concerning the proper definition of the workweek, calculation of the regular rate, and calculation of unpaid overtime. The Court considers their arguments in turn below.

### 1.    Definition of the Workweek

The FLSA defines overtime as work longer than 40 hours in a "workweek." 29 U.S.C. § 207(a)(1). Thus, it is "abundantly clear" that "the unit of time under that section within which to distinguish regular from overtime is the week." *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 579 (1942), *superseded by statute on other grounds*, Portal-to-Portal Act of 1947, ch. 52, 61 Stat. 84 (codified at 29 U.S.C. §§ 251–262), *as recognized in Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 n.22 (1985); *see also* 29 C.F.R. § 778.104 (stating that the FLSA "takes a single workweek as its standard," and that "[t]his is true regardless of whether the employee works on a standard or swing-shift schedule and regardless of whether he is paid on a daily, weekly, biweekly, monthly or other basis"). The DOL regulations further elaborate that the "workweek is a fixed and regularly recurring period of 168 hours—seven consecutive 24-hour periods" that "need not coincide with the calendar week but may begin on any day and at any hour of the day." 29 C.F.R. § 778.105. "Once the beginning time of an employee's workweek is established, it remains fixed regardless of the schedule of hours worked by him." *Id.*

Defendants point to evidence in the record establishing that Sabre's workweek was a seven-day period starting on Sunday at 12:00 a.m. and ending on Saturday at 11:59 p.m. (Dkt. No. 126-4, ¶ 10). Ms. Hanlon, Sabre's accounts manager, explains in her affidavit that "Sabre's Sunday to Saturday work week is stated in its Employee Handbook, a copy of which is provided

---

half) for any hours worked in excess of 55."); *Quiroz v. Luigi's Dolceria, Inc.*, No. 14-cv-871, 2016 WL 2869780, at *3, 2016 U.S. Dist. LEXIS 64662, at *10–12 (E.D.N.Y. May 17, 2016).

to new hires." *Id.* Defendants conclude from this fact that "the Sunday to Saturday week is what

must be used for purposes of calculating overtime." (Dkt. No. 126-2, at 11). Plaintiffs do not

provide an alternative basis for defining a different workweek, and only appear to oppose

Sabre's designated workweek for purposes of calculating the regular rate. (*See* Dkt. No. 141, at

6–11). In light of Defendants' uncontested evidence, the Court finds that Sabre's designated

workweek is the unit by which to calculate Plaintiffs' unpaid overtime in the event that they are

determined to be nonexempt employees at trial. The Court now turns to the distinct issue of

calculating Plaintiffs' regular rate.

### 2.      Calculation of the Regular Rate

DOL regulations provide that the "regular rate" under the FLSA is "a rate per hour," but

the FLSA "does not require employers to compensate employees on an hourly rate basis." 29

C.F.R. § 778.109. Employees' "earnings may be determined on a . . . salary . . . basis, but in such

case the overtime compensation due to employees must be computed on the basis of the hourly

rate derived therefrom." *Id.* For salaried employees whose "salary covers a period longer than a

workweek," the salary "must be reduced to its *workweek equivalent*." *Id.* § 778.113(b) (emphasis

added). For example,

> [a] monthly salary is subject to translation to its equivalent weekly
> wage by multiplying by 12 (the number of months) and dividing
> by 52 (the number of weeks). A semimonthly salary is translated
> into its equivalent weekly wage by multiplying by 24 and dividing
> by 52. Once the weekly wage is arrived at, the regular hourly rate
> of pay will be calculated as indicated [in subsection (a)].

*Id.* § 778.113(b). To calculate "the regular hourly rate of pay, on which time and a half must be

paid," the workweek-equivalent salary is divided "by the number of hours which the salary is

*intended to compensate*." *Id.* § 778.113(a) (emphasis added). "There is a rebuttable presumption

that a weekly salary covers 40 hours; the employer can rebut the presumption by showing an

employer-employee agreement that the salary cover a different number of hours." *See Giles v. City of New York*, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999).

There is no dispute that Plaintiffs received an annual salary in the amount of $72,000. (Dkt. No. 126-3, ¶¶ 5, 6; Dkt. No. 142, ¶¶ 5, 6). Therefore, under the regulations, Plaintiffs' workweek-equivalent salary is equal to $72,000 divided by 52 (the number of weeks in a year), yielding approximately $1,384.62 per week. *See* 29 C.F.R. § 778.113(b). Plaintiffs resist this calculation, arguing that "it defies the parties' intention for the salary to compensate a defined rotation of two weeks on, two weeks off." (Dkt. No. 141, at 6). But that argument—which zeroes in on the language in subsection (a) regarding "the number of hours which the salary is intended to compensate," 29 C.F.R. § 778.113(a)—is more properly directed at the calculation of the regular hourly rate, not the calculation of the workweek-equivalent salary.

The heart of the parties' dispute is the calculation of the regular hourly rate. Defendants contend that the regular rate is "determined by dividing the individual's weekly salary by the number of hours worked in each individual workweek," and that this rate "may change from week to week depending on the number of hours the individual worked in each week." (Dkt. No. 126-2, at 15). However, the cases Defendants cite in support of this calculation—the Supreme Court's *Missel* decision and the Seventh Circuit's decision in *Urnikis-Negro v. American Family Property Services*, 616 F.3d 665 (7th Cir. 2010)—involved situations where employees agreed to work an unlimited number of hours for a fixed salary. As discussed below, even assuming that Defendants' authorities apply in a misclassification case such as this one—a question of law that remains unsettled in this circuit—Plaintiffs dispute that they agreed to work an unlimited number of hours for a fixed salary. According to them, the record evidence shows that operators agreed to work 168 hours for each four-week rotation, (Dkt. No. 141, at 9 (arguing that "the salary was

23

compensation for working a defined rotation of two weeks on, two weeks off and a schedule of

84 hours in the weeks that the Operators were on"))—i.e., 42 hours per week. Given this factual

dispute, summary judgment on the method for calculating overtime damages is not appropriate.

### a.     *Missel* and the Fluctuating Workweek Method

In *Missel*, the employee seeking overtime compensation agreed to work "irregular hours

for a fixed weekly wage." 316 U.S. at 574–75; *see id.* at 580 (stating that "the employment

contract [was] for a weekly wage with variable or fluctuating hours"). Based on this agreement,

the Court found "[n]o problem" in "determining the regular rate of employment for the week in

question" by reference to "the actual hours worked" during that week. *Id.* at 580. The Second

Circuit has described *Missel*'s fluctuating workweek ("FWW") calculation method as follows:

> Under the FWW methodology for calculating overtime due under
> the FLSA to employees who have agreed to work at a fixed weekly
> salary but whose hours vary, an employee is assumed to have been
> paid for all hours worked at their regular rate of pay, with excess
> overtime due for hours worked over forty at one-half the regular
> rate of pay. The regular pay rate is calculated by dividing the
> weekly pay by total hours worked that week.

*Banford v. Entergy Nuclear Operations, Inc.*, 649 F. App'x 89, 90 (2d Cir. 2016).

After *Missel*, the DOL issued an interpretive rule allowing calculation of overtime under

the FWW method where: (1) "there is a clear mutual understanding of the parties that the fixed

salary is compensation (apart from overtime premiums) for the hours worked each workweek,

whatever their number, rather than for working 40 hours or some other fixed weekly work

period"; (2) the employee receives sufficient salary so that his regular rate never falls below the

statutory minimum wage; and (3) the employee "receives extra compensation, in addition to such

salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay." *Id.*

at 91 (quoting 29 C.F.R. § 778.114(a)).

In *Banford*, the Second Circuit noted that each circuit court "to consider the question has found that FWW may be used to calculate damages where . . . employees were misclassified as exempt from the FLSA, with some locating authority in 29 C.F.R. § 778.114 and others relying on *Missel*." *Id.* (citing, among others, the Seventh Circuit's decision in *Urnikis-Negro*, which approved the FWW method for calculating overtime in misclassification cases by relying on *Missel*). The Second Circuit panel nevertheless declined to "conclusively resolve" on appeal whether the FWW may be used for misclassified employees because, in that case, "the record evidence support[ed] the jury's verdict that no plaintiff agreed to a fixed weekly salary covering unlimited hours, making it unnecessary to apply the FWW method." *Id.*

*Banford*, however, recognized that district courts within this circuit remain "split on whether FWW may be applied retroactively" to misclassified employees. *Id.* For example, in *Costello v. Home Depot USA, Inc.*, 944 F. Supp. 2d 199, at 206 (D. Conn. 2013), the district court held that the FWW method in § 778.114 is inapplicable to misclassification cases because "it is simply logically impossible to have the kind of 'clear mutual understanding' involving the weekly wage rate and contemporaneous overtime premiums contemplated" by that section. The court also rejected the defendant employer's argument that *Missel*, independently of § 778.114, allows retrospective calculations of overtime for misclassified employees based on the FWW method. *See id.* at 206–07. Allowing that reading, the court reasoned, would "mean that an employer and an employee could mutually agree to depart from the standard, default FLSA arrangement of a forty-hour work week with time-and-a-half overtime, simply with an understanding that a salary is intended to cover all hours worked and with no mention at all of overtime payment." *Id.* at 207. Under this arrangement, the employee would be "waiving his entitlement to overtime payment, which is, simply, illegal." *Id.* Moreover, the *Costello* court read

*Missel* to require employment contracts "to include a provision regarding contemplation of payment of overtime"; without such a provision, the court reasoned, "there is no understanding as to an 'agreed wage' under *Missel*." *Id.* Finally, the court observed that the defendant's "reading of *Missel* and the FLSA plainly run counter to the policy implications of that case and the statute itself," as it would create a "perverse incentive to employers to misclassify workers as exempt." *Id.* at 208 (quoting *Perkins v. S. New Eng. Tel. Co.*, No. 07-cv-967, 2011 WL 4460248, at *4 n.5, 2011 U.S. Dist. LEXIS 109882, at *15 n.5 (D. Conn. Sept. 27, 2011)).

By contrast, the district court in *Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 436–39 (S.D.N.Y. 2013), concluded that the FWW method may be used to calculate overtime damages for misclassified employees. Though the court recognized that § 778.114 "on its own terms" is inapplicable in a misclassification situation because the regulation requires a "clear mutual understanding" that the fixed salary covers overtime compensation and payment of overtime, *id.* at 436–37, it interpreted *Missel* to allow the use of the FWW method in cases where "the parties have mutually agreed that a flat weekly wage would compensate the employee for all his hours, no matter their number," *id.* at 436–38. Nonetheless, the court in *Klein* did not agree with the Seventh Circuit's "categorical conclusion [in *Unikis-Negro*] that *Missel* should apply whenever an employee was paid a fixed salary, routinely worked substantial overtime hours, and never received overtime payments regardless of his work hours." *Id.* at 439. Instead, a factfinder would have to conduct "a factual inquiry into the actual agreement between the parties" and make "a nuanced determination of the understanding between a given employee and his employer" as to whether the fixed salary covered up to 40 hours or an unlimited number of hours. *Id.* The court denied summary judgment "because the underlying facts regarding what Plaintiff agreed to do to earn his salary remain in dispute." *Id.*

26

b.        **Dispute Concerning Number of Hours Agreed Upon**

The parties dispute what Plaintiffs' annual salary was expected to cover. Defendants contend that the annual salary "was designed to compensate the employee for all hours worked during the year." (Dkt. No. 126-4, ¶ 6). Aside from Mr. O'Hanlon's affidavit, Defendants point to the letters Plaintiffs received informing them that, as operators, they would be reclassified as exempt employees, and that operators' "work schedule will be based upon The Company's job scheduling responsibilities and time constraints." (Dkt. No. 126-2 (quoting Dkt. No. 126-5)). Defendants also cite the deposition testimony of some Opt-in Plaintiffs who appeared to acknowledge that they understood the $72,000 annual salary to cover all hours worked. (*See, e.g.*, Dkt. No. 126-7, at 9).

Plaintiffs respond that the "language in the promotion letters . . . is remarkably vague," and that operators could have reasonably believed that the reference to work schedules "referred to the two week on, two week off rotation, and 12 hour days that Plaintiffs were told they would work by Sabre management in exchange for their salary." (Dkt. No. 147, at 13). As for the deposition testimony, Plaintiffs note that Opt-in Plaintiffs also testified that they did not understand the salary to cover unlimited hours. (Dkt. No. 133, at 17). According to Plaintiffs, the record evidence shows that "the salary was meant to pay Operators for working a schedule of 84 hours a week on the weeks that they were on, with a rotation of two weeks on and two weeks off." (*Id.*).

Both parties have cited record evidence supporting their respective position as to what number of hours the annual salary was intended to cover. Such conflicting evidence creates a triable issue of fact that the Court must leave to a jury to determine. In light of the split among district courts in this circuit and the absence of Second Circuit authority, the Court declines at this time to rule on whether the FWW method can be used in misclassification cases. If the jury

27

determines that Plaintiffs' primary duty was the performance of nonmanual work, that such work was directly related to the management or general business operations of Sabre, and that it included the exercise of discretion and independent judgment on significant matters, Sabre will be found to have properly classified Plaintiffs as exempt under the FLSA, and the issue of calculating overtime damages will become moot. Likewise, if the jury finds, as in *Banford*, that Plaintiffs did not agree to work an unlimited number of hours for a fixed annual salary, the FWW method will be inapplicable under both § 778.114 and *Missel*. The parties will have an opportunity to advance their respective positions on the proper calculation of overtime damages in their pretrial submissions, including their proposed jury instructions, verdict forms, and special interrogatories. Accordingly, the Court denies both parties' motions for summary judgment as to the calculation of overtime damages.

## V.      CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiffs' motion for partial summary judgment as to Defendants' exemption defenses (Dkt. Nos. 127, 149-5) is **GRANTED in part** only to the extent that Defendants' executive, professional, and motor carrier exemption defenses are **DISMISSED with prejudice**, but otherwise **DENIED**; and it is further

**ORDERED** that Defendants' motion for partial summary judgment as to the calculation of overtime damages (Dkt. No. 126) is **DENIED**; and it is further

**ORDERED** that Plaintiffs' motion for partial summary judgment as to the calculation of overtime damages (Dkt. Nos. 127, 133) is **DENIED**.

**IT IS SO ORDERED.**

Dated: July 23, 2018
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge